UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WALTER BROWN, individually and
on behalf of all others similarly
situated,

            Plaintiff,

      v.

STEAK N SHAKE, INC.,

            Defendant.

CIVIL ACTION NO.

1:21-CV-4474-SEG

## **O R D E R**

This case is before the Court on Plaintiff Walter Brown's original and supplemental motions for conditional certification of an FLSA collective action (Doc. 23, 40) and on Plaintiff's motion for court-approved notice. (Doc. 25.) Defendant Steak 'n Shake, Inc. ("Steak 'n Shake") opposes both motions. (Doc. 44, 45.) Also before the Court is Plaintiff's motion for equitable tolling and other relief, which has been fully briefed. (Doc. 62, 63, 65.) After due consideration, the Court enters the following order.

## I.    **Background**

This is a Fair Labor Standards Act (FLSA) case against Defendant Steak 'n Shake, Inc. Plaintiff Walter Brown worked as a tipped server at several Steak 'n Shake restaurants in the Atlanta, Georgia area. (Doc. 23-1 ¶ 3-4.) At

each of these restaurants, Brown claims to have encountered a common set of company policies and practices that resulted in him being paid below the federal minimum wage. Plaintiff brought his complaint under the FLSA, 29 U.S.C. § 201, *et seq.*, on behalf of himself and a putative, nationwide collective.

### A.    Brown's FLSA Claim

Brown's one-count complaint asserts that Steak 'n Shake failed to pay him minimum wage in violation of 29 U.S.C. § 206. More specifically, he contends that Steak 'n Shake paid him at the "tip credit" rate – that is, far below minimum wage – in circumstances that were not permitted by law. Although he alleges a single cause of action, Brown claims that Steak 'n Shake violated the FLSA's minimum wage requirements in five distinct ways by: (1) requiring its servers to perform work, such as cleaning bathrooms, that was unrelated to their jobs as servers; (2) requiring servers to spend more than 20% of their time performing non-tipped work related to their tipped occupation; (3) requiring servers to perform non-tipped work for a prolonged periods; (4) failing to provide an FLSA-compliant tip notice; and (5) shifting the cost of uniforms to employees who were paid less than minimum wage.

In the timeframe relevant to this action, Steak 'n Shake operated 200 restaurants in 16 states. (Doc. 32-4 ¶ 3.) Prior to March 2020, it employed more than 14,000 tipped servers nationwide.

By declaration and deposition, Brown has recounted his experience as a tipped sever at Georgia-based Steak 'n Shake restaurants in Alpharetta, Roswell, Cumming, Druid Hills, and Smyrna.  (Doc. 23-1 at 4; Doc. 40-5 at 8.)  At those restaurants, Brown frequently was required, while earning $2.13 per hour, to perform work duties that did not earn tips.  For example, during shifts for which Steak 'n Shake paid him $2.13 per hour (Doc. 1 ¶ 44; Doc. 40-5 at 62), Brown had to clean the bathroom, sweep the parking lot, wash dishes, prepare milkshakes, and work the drive-thru, fry, and sandwich stations.  (Doc. 40-5 at 15, 29, 50-51.)  None of these tasks generated tips to make up the difference between $2.13 and the federal minimum wage.

In further support of his certification request, Brown submitted declarations, depositions, and other evidence tending to show that his experience was common to people employed by Steak 'n Shake as tipped servers in restaurants across the country.  His evidence included sworn statements from ten employees who worked at sixteen Steak 'n Shake restaurants in five states.  Those employees declared that they too were required to spend hours per shift performing non-tip-generating work, and that they were also compensated below the federal minimum wage.

The testimonial evidence is corroborated in part by some of Defendant's policies and other documents.  Steak 'n Shake's Daily Side Work Duties Chart,

according to Brown, reflects company policy requiring servers to do non-tipped tasks, like bathroom-cleaning.   (Doc. 40-3.)   Plaintiff further alleges that although Defendant paid lip service to FLSA requirements in its written policies, it had no mechanism in practice to track the time that servers spent doing non-tipped work.  Steak 'n Shake's policies left Brown with paychecks that compensated him at rates not permitted under the FLSA.  (*See, e.g.*, Doc. 40-5 at 29.)

In sum, Brown seeks conditional certification because he and other tipped servers: performed the same primary job duties across all restaurants; had the same job description; were required to follow the same employee handbook, completed the same training; used same time keeping system; were required to pay for the same uniforms; received the same "pay and tip acknowledgement" form; and were paid less than minimum wage under circumstances not permitted by the FLSA.

### B.    Procedural History

Brown filed his complaint on October 28, 2021.  On December 31, 2021, he filed a motion for conditional certification and for court-authorized notice, to which he attached declarations from ten Steak 'n Shake servers.  (Doc. 23.) Plaintiff initially sought certification of a nationwide class to include:

> [A]ll current and former tipped employees who worked for Defendant for at least one week during the three year period prior to the filing of this action to the present.

Compl. ¶ 69. He later modified this request, seeking conditional certification instead of a class of:

> Servers who worked for Defendant for at least one week during the 3 year period prior to the date the Court grants conditional certification, to the present.

(Doc. 23 at 7.)

As of January 2022, Steak 'n Shake estimated that a nationwide collective, if certified, would comprise 14,408 members. (Doc. 32-4 ¶ 5.) Out of that number, 1,028 servers were employed in Georgia. (*See id.*)

On January 5, 2022, the Court held a telephone conference to discuss pre-certification discovery and other matters. (Doc. 41.) The Court granted the parties a brief period of pre-certification discovery to take key depositions and exchange documents. (Doc. 41.) At the conference, Plaintiff's counsel also asked the Court to toll the statute of limitations to preserve class members' claims.[1] (Doc. 41 at 13.) No specific reason for tolling was provided, and the

---

[1] Plaintiff did not raise the tolling issue again until March 3, 2023, when he filed the instant motion for equitable tolling and other relief. (Doc. 62.)

Court declined, at the conference, to toll the statute of limitations for putative plaintiffs. (*Id*. at 14.)

On January 21, 2022, Defendant filed a motion to partially dismiss the case, or in the alternative, to transfer venue to the Southern District of Indiana, the jurisdiction in which Defendant is headquartered. (Doc. 32.) Defendant argued, based largely on the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255 (2017), and decisions applying that case in the context of FLSA collective actions, that this Court lacked specific personal jurisdiction over it with respect to the claims of non-Georgia opt-in plaintiffs.

On February 28, 2022, Plaintiff, with the benefit of limited discovery, filed a supplemental motion for conditional certification, to which he attached the depositions of Plaintiff and two of Defendant's employees, among other evidence. (Doc. 40.) All briefing related to the motion to dismiss and motion for conditional class certification was completed by March 22, 2022.[2] On August 8, 2022, the Court heard oral argument.

On February 10, 2023, the Court entered an order finding, in line with the growing weight of circuit authority, that it lacked personal jurisdiction over

---

[2] This case was transferred to the undersigned on April 18, 2022.

the claims of the non-Georgia opt-in plaintiffs.  Following the reasoning of the Third, Sixth, and Eighth circuits,[3] this Court determined that because the non-Georgia opt-in claims did not arise out of or relate to Steak 'n Shake's contacts with Georgia, the Court lacked personal jurisdiction over Defendant with respect to them.  (Doc. 58 at 22.)  The Court held its judgment on the requested partial dismissal in abeyance, however, pending a response from Plaintiff about whether he wished to pursue a Georgia-based collective or instead preferred transfer of the case to the Southern District of Indiana.

On March 3, 2023, Plaintiff filed a motion for equitable tolling and other relief.  He asserts that Steak 'n Shake stopped employing tipped servers as of March 2020.  (Nevin Decl., Doc. 44-1 at 3.)  Accordingly, the claims of most or all putative plaintiffs, unless tolled, have expired.  *See* 29 U.S.C. § 255 (providing statute of limitations of two years for non-willful FLSA violations and three years for willful FLSA violations).

To date, 59 people have opted into this case.  (*See, e.g.*, Doc. 11, 17-19, 21, 29-30.)  Steak 'n Shake contends – and Brown does not appear to dispute –

---

[3] *See Fischer v. Fed. Express Corp.*, 42 F.4th 366 (3d Cir.), *cert denied*, 143 S. Ct. 1001 (2023); *Canaday v. Anthem Companies, Inc.*, 9 F.4th 392 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 2777 (2022); *Vallone v. CJS Sols. Group, LLC*, 9 F.4th 861 (8th Cir. 2021).  *Cf. Waters v. Day & Zimmermann NPS, Inc.*, 23 F.4th 84 (1st Cir.), *cert. denied*, 142 S. Ct. 2777 (2022).

that 48 of the 59 opt-in plaintiffs worked at Steak 'n Shake restaurants outside Georgia.  (Doc. 32 at 7; Doc. 32-4 ¶ 4.)

In his latest motion, Plaintiff asks the Court to toll the claims of putative Georgia opt-in plaintiffs, toll the claims of non-Georgia opt-ins, and certify a class consisting of:

> [A]ll current and former tipped employees who worked for Defendant in Georgia for at least one week during the three-year period prior to the filing of this action to the present.[4]

Plaintiff also asks the Court to transfer the non-Georgia opt-in claims, but requests time to identify the courts to which he wants them transferred.

## II.    Plaintiff's Motion for Certification of Collective Action

### A.    Legal Standard

The FLSA was enacted to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."  29 U.S.C. § 202(a).  To that end, Section 216(b) of the FLSA states that an employee may bring an action for himself and "other employees similarly situated."   29 U.S.C. § 216(b).   A collective action under § 216 differs from class actions brought under Rule 23

---

[4] Brown seeks to exclude from his class "any individuals who are current plaintiffs in *Berry, et al. v. Steak N. Shake, Inc*., No. Civ. A. 1:20-cv-2932-JMS-MPB (S.D. Ind.) or who worked in Ohio."  (Doc. 23 at 1, n.1.)

of the Federal Rules of Civil Procedure.  One difference between the two is that, under § 216, a similarly situated employee must "opt-in" to the collective action to be bound by the litigation's adjudication, whereas under Rule 23, a similarly situated employee must "opt out" to avoid being bound.

> An action . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).  A district court, in appropriate cases, may authorize the sending of notice to potential class members in a collective action.  *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169-70 (1989); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); *Haynes v. Singer Co., Inc.*, 696 F.2d 884, 886-87 (11th Cir. 1983).  "The benefits of a collective action depend on employees receiving accurate and timely notice so that they can make informed decisions about whether to participate." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008) (quotation marks, citation, and punctuation omitted).

The Eleventh Circuit has endorsed a two-step approach for determining whether to certify a collective action under Section 216(b).  *Hipp*, 252 F.3d at

1218.  Under the two-step approach, the Court first decides if the class should be "conditionally" certified:

> The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision—usually based only on the pleadings and affidavits which have been submitted—whether notice of the action should be given to potential class members.  Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class.  If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in."  The action proceeds as a representative action throughout discovery.

*Id.* (citation omitted).  The burden is on plaintiff to show that he and the members of the proposed collective action are "similarly situated."  *Morgan*, 551 F.3d at 1260.  To meet this burden, plaintiff must provide a "reasonable basis" for the claim that "there are other similarly situated employees."  *Id.* During the conditional certification stage, courts use a "fairly lenient standard" that is "flexible" and "not heavy."  *Id.*  Once the "similarly situated" requirement is met, and the plaintiff establishes that there are other employees who wish to opt into the action, the court "conditionally certifies" the collective action.  *Id.*; *Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991).[5]

---

[5] Some discovery has taken place in this case, but not the kind of "significant discovery" that warrants application of a heightened standard of proof in place

The second stage of the certification process is "typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007). Based on the facts gathered in discovery, the district court determines, according to a more rigorous standard, whether the claimants are actually similarly situated and, if not, decertifies the class so that the original plaintiffs may proceed to trial on their individual claims. *See id.* Ultimately, "the decision to create an opt-in class under [Section] 216(b) . . . remains soundly within the discretion of the district court." *Hipp*, 252 F.3d at 1219.

## B.   Whether Potential Collective Members are Similarly Situated to Plaintiff

The Court first addresses whether Brown and the proposed collective members are similarly situated. Plaintiff bears the burden of demonstrating that he is similarly situated with the group of employees he wishes to represent. *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996). While "similarly situated" is not defined in the FLSA, the Eleventh Circuit has

---

of the usual "fairly lenient standard." *Cf. Ide v. Neighborhood Rest. Partners, LLC*, 32 F. Supp. 3d 1285 (N.D. Ga. 2014), *aff'd*, 667 F. App'x 746 (11th Cir. 2016) (applying heightened standard where parties engaged in eight months of discovery before certification).

advised that "[p]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members." *Hipp*, 252 F.3d at 1217 (citation omitted). "A unified policy, plan, or scheme of discrimination may not be required to satisfy" the similarly situated requirement. *Id.* at 1219 (citation omitted). However, a plaintiff "must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions . . ." *Marsh v. Butler Cnty. Sch. Sys.*, 242 F. Supp. 2d 1086, 1093 (M.D. Ala. 2003). To prevail on a motion to conditionally certify a class, a plaintiff must demonstrate a "'reasonable basis' for his claim of class-wide discrimination" by means of "detailed allegations supported by affidavits." *Grayson,* 79 F.3d at 1097 (quoting *Haynes v. Singer Co., Inc.,* 696 F.2d 884, 887 (11th Cir. 1983)). At the notice stage, courts consider all the evidence before them. *See id*.

An explanation of the nature of the FLSA claim at issue is a helpful starting point in the first part of the certification inquiry. The FLSA generally requires employers to pay a non-exempt employee no less than the minimum wage, 29 U.S.C. § 206(a), but the statute is subject to an exception in the case

of certain tipped employees. 29 U.S.C. § 203(m)(2)(A).[6] Under 29 U.S.C. § 203(m), an employer can pay a tipped employee less than the minimum wage, provided that the tips the employee receives at least make up for the difference between what the employer pays and the minimum wage. *Rafferty v. Denny's, Inc.,* 13 F.4th 1166, 1172 (11th Cir. 2021). An employer can take the so-called "tip credit" only as to "those tipped employees whom the employer has informed" that it will use tips in satisfaction of part of its minimum wage obligation. *See id.; see also* 29 U.S.C. § 203(m)(2)(A).

Here, the parties agree that Brown and other servers were tipped employees under the FLSA. Plaintiff alleges that Defendant violated the federal minimum wage laws in its treatment of tipped employees in five distinct ways. They are discussed below.

### 1. **Dual Jobs Violation**

The Department of Labor has promulgated regulations to implement the FLSA's tip credit provision. The so-called "dual-jobs" regulation, 29 C.F.R. § 531.56, clarifies the meaning of "tipped employee" as that phrase appears in

---

[6] A "tipped employee" means "any employee engaged in an occupation in which [s]he customarily and regularly receives more than $30 a month in tips." *Id*. § 203(t).

the FLSA's definition section, 29 U.S.C. § 203(t).  *Rafferty*, 13 F.4th at 1173.

Subsection (e) of § 531.56 states:

> (e) Dual jobs. In some situations an employee is employed in a dual
> job, as for example, where a maintenance man in a hotel also
> serves as a waiter. In such a situation the employee, if he
> customarily and regularly receives at least $30 a month in tips for
> his work as a waiter, is a tipped employee only with respect to his
> employment as a waiter. He is employed in two occupations, and
> no tip credit can be taken for his hours of employment in his
> occupation of maintenance man. Such a situation is
> distinguishable from that of a waitress who spends *part of her time*
> cleaning and setting tables, toasting bread, making coffee and
> *occasionally* washing dishes or glasses. It is likewise
> distinguishable from the counterman who also prepares his own
> short orders or who, as part of a group of countermen, takes a turn
> as a short order cook for the group. Such *related duties* in an
> occupation that is a tipped occupation need not by themselves be
> directed toward producing tips.

29 C.F.R. § 531.56(e) (emphasis added).

The dual-jobs regulation thus contemplates that there is a "limit on the

amount of time an otherwise tipped employee may spend doing untipped work

before the employer can no longer claim the tip credit."  *Rafferty*, 13 F.4th at

1180.  The regulation also draws a distinction between duties related to a

tipped occupation and duties that are unrelated.  In the Eleventh Circuit, "the

dividing line between related and unrelated duties falls where untipped duties

no longer directly support tipped duties."  *Id*. at 1189.

14

Turning to this case, Brown performed numerous duties that were unrelated to his job as a server. (Doc. 23-1.) Those duties included picking up trash, mopping and sweeping, cleaning the bathroom, and cleaning tea urns, faucets, counters, shelves, and the soda dispenser. (*Id.* ¶ 5.) Brown further states that he was trained and required to do non-tipped tasks throughout his shift, including working the cash register and drive-thru station, sweeping the parking lot, and washing dishes. (*Id.* ¶ 6; Doc. 40-5 at 15, 29, 50-51.) Brown earned less than minimum wage while employed in these tasks. (*Id.* ¶ 5-6.) In addition to his own declaration, Brown submitted declarations from ten other servers who claim that they too were paid below minimum wage for hours spent cleaning bathrooms, washing dishes, and doing tasks unrelated to their server jobs.[7]

Defendant argues that Brown's experience cannot be similar to that of other employees because Steak n' Shake has written policies that acknowledge the dual-jobs regulation and require compliance with it. To this, Brown responds that such policies may exist on paper, but they are not followed in

---

[7] While the Court lacks jurisdiction over Defendant to adjudicate the claims of non-Georgia opt-in plaintiffs, it nevertheless considers the declarations of persons who worked outside Georgia in the conditional certification decision. Plaintiff claims that Defendant's policies were uniform at restaurants within Georgia and across the country. The alleged similarity of Defendant's policies and servers' experiences are relevant to certification.

practice, as evidenced by the various server declarations on the record of this case. Plaintiff has the better argument here, as the mere fact that an employer maintains FLSA-compliant written policies cannot alone defeat conditional certification. *See, e.g., Flood v. Carlson Restaurants Inc.*, No. 14 CIV. 2740 AT, 2015 WL 260436, at *4 (S.D.N.Y. Jan. 20, 2015) (stating that "the existence of a formal policy [in compliance with the FLSA] should not immunize the defendant where," as here, "the plaintiffs have presented evidence that this policy was commonly violated in practice.") (quotation and citation omitted).

Defendant next argues that servers' experiences varied according to the differing management practices in its restaurants, and that adjudication of Plaintiff's dual-jobs claim would require cumbersome, individualized inquiries. At least at the notice stage, however, the Court is not compelled by Defendant's insistence that individual inquiries would swamp the management of the case as a collective action. This is so in part because Steak 'n Shake had a standardized document titled "Server Side Work Chart," which applied to all servers in all restaurants. The document lists server duties, including a requirement that servers perform tasks such as "[c]lean [the] hand sink and refill soap and towels." (Doc. 40-3). Similarly, Defendant's "Server Training Outline" directs servers to sweep and mop, bus tables, pick up trash and debris from the floor, clean counters, and do other maintenance tasks. (Doc. 23-21.)

These documents and accompanying deposition testimony from corporate representatives are sufficient to show – at least at this stage – a uniform practice of requiring servers to perform significant amounts of non-tipped work, unrelated to servers' duties. *See Flood*, 2015 WL 260436, at *4 (certifying a nationwide collective action of tipped workers who alleged that they were paid less than minimum wage and spent a substantial amount of time performing non-tipped side work).

### 2. Violation of 80/20 Rule

The second alleged violation is a species of the first. The 80/20 rule refers to a Department of Labor (DOL) interpretation of the dual-jobs regulation. *Rafferty*, 13 F. 4th at 1175. Under the 80/20 rule, an employer can take the tip credit for time spent performing duties *related to the tipped occupation* if the employee did not perform those duties for more than 20% of her working hours. *Id*. at 1175. The Eleventh Circuit considers that the 20% limit "reasonably construes the dual-jobs regulation." *Id*. at 1189.

Here, Brown alleges that Steak 'n Shake required tipped servers to spend more than 20% of their time per shift performing non-tip producing side work that was related to their tipped occupation (*e.g.* rolling silverware, refilling condiments, cleaning tables and booths, etc.). (Brown Decl., Doc. 23-1 ¶ 5-10.) It was often the case that Brown lacked customers for more than 30

minutes, was required to perform such side duties, and was paid less than minimum wage. (*Id*. ¶ 7-10.) Other declarants said the same or similar. The Server Training Outline (Doc. 23-21) and Server Side Work Chart (Doc. 40-3) also tend to show that Brown and others were expected to perform many non-tipped tasks.

Here again, Defendant responds that its written policy expressly limits the amount of time that servers could spend on side duties to no more than 20% of the shift. But Brown, confronted in his deposition with Defendant's written policies, did not agree that they were followed in practice.

> Q: There's also some important provisions in there . . . You must never spend more than 20 percent of your server time performing incidental duties. Did you see that?
>
> A: I do.
>
> Q: And you agreed to this section, true?
>
> A: I don't agree to that, because we spent more than 20 percent of our time, especially trying to do side work and – you know, to get out on time.

Brown Dep., Doc. 40-5 at 101.

> Q: Okay. And do you believe that work was . . . [m]ore than 20 percent of your server time?
>
> A: Most definitely.

*Id.* at 102.

Q: Did you ever feel that you were exceeding 20 percent of your incidental time?

A: That was all the time.

*Id.* at 103. And to the extent that there are credibility determinations to be made here, they are to be considered later in the case. *Samayoa v. Buckhead Life Restaurant Group, Inc.*, No. 1:18-cv-237, 2018 WL 11447827, at * 5 (N.D. Ga. July 24, 2018) (courts are not to weigh evidence at the notice stage).

Defendant next expresses doubt that the alleged 80/20 violation can be adjudicated on a collective-wide basis. It argues, correctly, that the FLSA does not forbid the tip credit in all instances in which employees perform non-tipped activities, but only when such non-tipped duties exceed 20% of the employee's work time. As such, Defendant argues, adjudication of the alleged 80/20 violation on a collective basis would require determinations of the time that each server spent performing non-tipped work. It further contends that putative class members are not similarly situated because some managers permitted servers to clock in at the production rate (meaning, at a rate of pay that was minimum wage or above) while those servers did non-tipped work.

Here, however, we are at the conditional certification phase, and Brown need only show that he is "similarly situated to the putative class members with respect to *the nature of the alleged violations*." *Jewell v. Aaron's, Inc.*, No.

19

1:12-CV-0563-AT, 2012 WL 2477039, at * 5 (N.D. Ga. June 28, 2012). This he has done. Plaintiff's evidentiary record consists of eleven declarations, five depositions of servers, point-of-sale data, a common server job description and list of duties, and two, 30(b)(6) depositions of Steak 'n Shake corporate representatives. The declarations and depositions, if they are credited, tend to show that servers had the common experience of being required to spend more than 20% of their time doing non-tipped work related to their server jobs. The point-of-sale data combined with pay records allegedly demonstrates that servers were paid the tipped rate for long stretches while they were without customers. Other documentary evidence suggests that servers' duties were similar across the board. And a corporate representative acknowledged in her deposition that Defendant had no way of tracking how much time servers spent on non-tipped side work. Summers Dep., Doc. 40-1 at 115. Taken together, the evidence is sufficient at this stage to show that Brown was similarly situated to other collective members who claim to have been required to work more than 20% of their shifts on non-tipped duties related to their server roles.[8]

---

[8] Steak 'n Shake faults Brown for not keeping track of his time spent doing side work and for not refusing to perform side work in excess of 20% of his shift. (Doc. 44 at 8.) Brown, in his deposition, discusses the disciplinary consequences that likely would have resulted for a server who – mid-shift – refused to perform necessary side-duties. More to the point, the Eleventh Circuit has made clear that "[i]t is the duty of the employer – not the employee – to keep

Other district courts have certified collective actions – even nationwide actions – alleging violation of the 80/20 rule under similar circumstances. *See, e.g., Alverson v. BL Restaurant Operations, LLC*, 2017 WL 5491998 (W.D. Tex. Nov. 15, 2017) (conditionally certifying a nationwide class of tipped employees, where plaintiffs alleged they spent more than 20% of their time performing non-tip generating side work and were paid less than minimum wage); *Flood v. Carlson Restaurants Inc.*, No. 14 CIV. 2740 AT, 2015 WL 260436 (S.D.N.Y. Jan. 20, 2015) (conditionally certifying a nationwide class of tipped employees and relying on evidence that defendants' side work practices resulted in an alleged pattern of 80/20 violations rule); *Fast v. Applebee's International, Inc.*, 243 F.R.D. 360 (W.D. Mo. June 19, 2007) (certifying a nationwide collective of tipped employees in an 80/20 case and rejecting employer's argument that certification was improper because each restaurant's manager scheduled employees and assigned duties independently). Defendant may renew its argument about individualized inquiries at the decertification stage. For now,

_____

track of the employee's 'wages, hours, and other conditions of employment.'" *Rafferty*, 13 F.4th at 1190 (quoting *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007)). At the merits stage, Brown need not produce evidence of how he spent each minute and hour of his shifts. *Id.* He can meet his burden if he proves that he has performed work for which he was improperly compensated so long as he produces sufficient evidence to show the amount and extent of that work "as a matter of just and reasonable inference." *Id.* at 1191.

Plaintiff has shown he is similar to other servers for purposes of the 80/20 rule violation.

### 3.    Non-Tipped Work for Continuous Periods of Time

The third alleged FLSA violation – that Defendant required servers to do non-tipped work for continuous periods of time – overlaps significantly with the first and second.[9]  It is therefore addressed only briefly below.

Under the FLSA, the tip credit applies only to "tipped employees," § 203(m), and as such an employer may only take the tip credit "for hours worked by [an] employee in an occupation in which [he] qualifies as a 'tipped employee.'" 29 C.F.R. § 516.59(b).  An employer cannot claim the "tip credit for hours that [are not] tip-credit eligible." *Romero v. Top-Tier Colorado LLC*, 849 F.3d 1281, 1285 (10th Cir. 2017).

Plaintiff alleges that Defendant required servers to perform non-tipped work for prolonged periods of time, typically at the beginning or end of a shift, such that Steak 'n Shake was not authorized to take the tip credit.  Here again, Plaintiff points to declarations from servers who say they spent hours per shift performing non-tipped work that was compensated below minimum wage. Plaintiff further cites to point-of-sale data and corresponding time records

---

[9] The overlap is so significant that the Court is unsure as to whether it is actually a separate theory of liability.

purporting to show that Brown and others were paid $2.13 per hour for long periods during which they had no customers.  Mark Doerr, Defendant's Director of Enterprise Applications, acknowledged in his deposition that certain such instances had occurred.[10]  Susan Summers, Defendant's VP of Field Integration, stated in her deposition that servers "are paid their server rate while they're a server and doing their side work duties."  (Summers Dep., Doc. 40-1 at 122.)

Defendant's chief argument against certification on this claim is that one cannot tell from the data whether tipped employees, as a class, performed excessive, non-tipped work during periods when they had no customers.  But here again, at the notice stage, Brown need only show that he is similarly situated to the putative class members with respect to the nature of the alleged FLSA violation.  *Jewell*, 2012 WL 2477039, at *5.  He has done so.

### 4.   Tip Notice

An employer cannot claim the employee's tips as wages unless it has provided proper notice if its intention to do so to the employee.  *See* 29 U.S.C.

---

[10] Doerr Dep., Doc. 40 at 16 (acknowledging that point-of-sale data for one server showed the server was clocked in at a tipped rate for two hours with no evidence of any customers during that time); *id*. at 17 (acknowledging that point-of-sale data for Brown showed that, at on at least one occasion, Brown did not have customers for two hours and 41 minutes, and that he was paid at the tipped rate).

§ 203(m) (stating the tip credit provision "shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection"). Under the FLSA, the employer must expressly inform the employee that it will claim the employee's tips as wages. *See id.*; *Rosas v. Nunez, Inc.*, No. 1:09-CV-3208-WSD, 2010 WL 11600977, at *2 (N.D. Ga. Sept. 30, 2010).

29 C.F.R. § 531.59(b) clarifies the meaning of Section 203(m)'s notice requirement. It directs an employer to inform its tipped employees of the following five facts:

> (1) the amount of cash wage the employer is paying a tipped employee, which must be at least $2.13 per hour;
> (2) the additional amount claimed by the employer as a tip credit, which cannot exceed $5.12 (the difference between the minimum required cash wage of $2.13 and the current minimum wage of $7.25);
> (3) that the tip credit claimed by the employer cannot exceed the amount of tips actually received by the tipped employee;
> (4) that all tips received by the tipped employee are to be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and
> (5) that the tip credit will not apply to any tipped employee unless the employee has been informed of these tip credit provisions.

29 C.F.R. § 531.59(b).

Here, Defendant's Server Pay and Tip Acknowledgment form, which allegedly was provided to all servers, states in part:

I further understand that Steak n Shake follows all state and federal laws, 29 C.F.R. sections 531.54 and 531.59(b), regarding the payment of "Tipped Employees" and it uses tip credit as defined by 29 C.F.R. section 203(m), in particular: The amount of cash wage/hourly rate of pay paid to a Tipped Associate is at least $2.13 per hour; All tips received by a "Tipped Employee" are retained by that Associate and there is no tip pooling; and The tip credit claimed by Steak n Shake, the employer, (a) cannot exceed the amount of tips actually received by the "Tipped Employee", (b) cannot exceed the difference between the minimum required cash wage and the current minimum wage and (c) cannot be claimed unless the "Tipped Employee" has been informed of these tip provisions.

(Doc. 44-1 at 127) (capitalization and punctuation as in original).[11]

A side-by-side comparison of 29 C.F.R. § 531.59(b) and the Defendant's Server Pay and Tip Acknowledgment form suggests that Defendant did inform servers of the provisions in § 531.59(b)(1)(3) and (5), but arguably did not inform servers of the provisions in § 531.59(b)(1)(2) and (4).[12] Certification is appropriate because Brown and the putative class members allegedly received

---

[11] Defendant's Associate Handbook contains similar language. (Doc. 44-1 at 122-25.)

[12] The parties' briefing on the alleged tip notice violation is cursory. In his initial brief in support of certification, Plaintiff states that Defendant "failed to provide proper notice of the tip credit" but does not elaborate much further. (Doc. 23 at 27.) In his supplemental brief, Plaintiff devotes three sentences in a footnote to the alleged tip notice violation, with no citation to legal authority and no discussion of why the notice supplied was insufficient. (Doc. 40 at 16 n. 2.) Defendant does not really defend its notice provision, but perhaps it will do so at the merits stage.

the same deficient notice (Doc. 40-1 at 106-107), and its legality can be determined on a collective-wide basis. It may later be shown that Defendant's tip credit notice was fully FLSA-compliant, or that Defendant supplied appropriate notice in some other way. *See, e.g., Ide v. Neighborhood Rest. Partners, LLC*, 32 F. Supp. 3d 1285, 1293 (N.D. Ga. 2014), *aff'd*, 667 F. App'x 746 (11th Cir. 2016) (finding that employee handbook and "Wage and Hour Poster" appropriately informed defendant's employees of the requirements of § 203(m)). But that is a merits question for another day.

### 5. Uniform Violation

All Steak 'n Shake servers were required to wear certain items of clothing while on duty. (Doc. 40-1 at 98.) The server uniform consisted of a white, short-sleeved, oxford shirt, solid black slacks, black socks, and slip-resistant, rubber-soled shoes. (Doc. 40-1 at 98-100.)[13] Servers allegedly were required to pay for their uniforms and were not reimbursed. Plaintiff contends that Defendant violated the FLSA by paying him and others below minimum wage and shifting the cost of uniforms onto them.

---

[13] Defendant appears not to challenge Plaintiff's assertion that the clothing items listed above constitute a "uniform" as contemplated by 29 C.F.R. § 531.32. *See, e.g., Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1244 (11th Cir. 2002) (discussing the distinction under FLSA regulations between a uniform and "ordinary street clothing," the latter of which is a "normal living expense" paid "not primarily for the benefit of the employer.")

The FLSA places certain limitations on the circumstances under which an employer may shift work-related expenses onto minimum wage employees. The Eleventh Circuit has said that:

> An employer may not deduct from employee wages the cost of facilities which primarily benefit the employer if such deductions drive wages below the minimum wage. *See* 29 C.F.R. § 531.36(b). This rule cannot be avoided by simply requiring employees to make such purchases on their own, either in advance of or during the employment.

*Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1236-37 (11th Cir. 2002) (finding that FLSA requires employers to reimburse farmworkers for pre-employment transportation expenses which primarily benefited employers, to the point that wages were at least equivalent to minimum wage). Brown's allegations, if true, may show an FLSA violation.

Defendant has little to say in response to the FLSA/uniform claim. It argues that Brown's deposition testimony undermines this claim. The cited part of the deposition reads:

> Q: Did you have any grievance or complaint in this lawsuit about the clothes Steak 'n Shake made you wear?
>
> A: No. I didn't. I didn't like the idea of paying but, no. I didn't.
>
> . . .
>
> Q: Is any part of your lawsuit that you're suing Steak 'n Shake for about right now the clothes or uniform you had to wear?

A: No.

The foregoing testimony shows, at most, that Defendant's lawyer succeeded in eliciting testimony in which Brown appears confused about the scope of his claim. Later in the deposition, however, Brown clarified that he paid for his uniform, that Defendant did not reimburse him, and that he was in fact asserting a legal claim relating to Steak 'n Shake's failure to reimburse him. (Doc. 40-5 at 282-283.)

In sum, Plaintiff has provided evidence that Steak 'n Shake servers were required to pay for their uniforms, were not reimbursed, and were paid less than minimum wage. An adjudication in Brown's favor would apply to all collective action members. *See, e.g.*, *Nail v. Shipp*, No. CV 17-00195-KD-B, 2019 WL 3719397, at *9 (S.D. Ala. Aug. 6, 2019) (granting summary judgment to plaintiffs on their claim that employers violated the FLSA by requiring tipped employees to pay for aprons to be worn as a required part of workers' uniforms). Brown has met his burden of showing that he is similarly situated to other servers with respect to the FLSA/uniform claim.

## C. Whether Plaintiff Has Established that Other Plaintiffs Would Join the Collective Action

The Court turns to the next requirement: whether there are other workers who wish to opt into the action. A review of the docket shows that

there are.  Brown filed the declarations of ten former Steak 'n Shake servers who assert the same or similar allegations against Steak 'n Shake.  (Doc. 23-1, 23-2, 23-3, 23-4, 23-5, 23-6, 23-7, 23-8, 23-9, 23-10, 23-11.)  Brown has since obtained consents to join the case from 59 opt-in plaintiffs, about 11 of whom worked in Georgia.  (Doc. 11, 17-19, 21, 29-30, 37-38.)  Based on the foregoing evidence, the Court is reasonably satisfied that there are other employees of Defendant who wish to opt in and who are similarly situated in their job requirements and pay provisions.  *McCray v. Cellco P'ship*, No. 1:10-CV-2821-SCJ, 2011 WL 2893061, at *2 (N.D. Ga. Apr. 8, 2011); *see also Riddle v. Suntrust Bank*, No. 1:08-cv-1411-RWS, 2009 WL 3148768 at *3 (N.D. Ga. 2009) (finding that because notice had not yet been sent to putative class members, the existence of only three opt-in plaintiffs sufficiently demonstrated interest by other employees to opt into the suit).

In summary, "[t]he first stage in the two-step approach to certification employed in the Eleventh Circuit holds out a very low bar for plaintiffs to become conditional certified."  *Florence v. Deli Mgmt., Inc.*, No. 1:18-CV-4303-SCJ, 2018 WL 7474860, at *1 (N.D. Ga. Dec. 18, 2018) (citing *Hipp*, 252 F.3d at 1217-18 (11th Cir. 2001)).  Given the evidence presented, Plaintiff has more than met the lenient conditional certification standard.  *See Harding v. Steak N Shake, Inc.*, No. 1-21-CV-01212, 2022 WL 658955, at *4 (N.D. Ohio Feb. 11,

29

2022) (certifying an Ohio-based, statewide FLSA class of "[a]ll current and former tipped employees who worked for Steak 'n Shake for at least one week in Ohio during the three-year period prior to the date the Court grants conditional certification to the present.").

## III.   Plaintiff's Motion for Equitable Tolling and Other Relief

Plaintiff's motion for equitable tolling and other relief asks the Court to do four things: (1) transfer the claims of out-of-state opt-in plaintiffs to "the forum of their choosing"; (2) toll the statute of limitations for Georgia-based putative class members to account for the time that has elapsed since Plaintiff's initial request for collective action status; (3) toll the statute of limitations for non-Georgia opt-in plaintiffs; and (4) modify the proposed class definition "to encompass the original class definition in the Complaint." (Doc. 62 at 1-2.) The Court addresses each request in turn.

### A.   Plaintiff's Request to Transfer the Claims of Out-of-State Opt-In Plaintiffs to the Forum of their Choosing

Most opt-in plaintiffs who filed consents to join this case – 48 out of 59 opt-ins – worked at restaurants outside Georgia. After these plaintiffs filed consents to join, the Court determined that it lacked personal jurisdiction over their claims. It must now be decided what is to become of them.

Brown asks the Court to transfer the claims to other federal district courts under 28 U.S.C. § 1631. His motion does not identify the jurisdictions to which he seeks transfer, but rather requests a "reasonable period to select the appropriate forum for their claims." (Doc. 62 at 11; Doc. 65 at 14.) Defendant opposes transfer, arguing that this Court lacks authority under § 1631 to transfer claims over which it does not have personal jurisdiction.

Section 1631 states:

> Whenever a civil action is filed in a court . . . and that court **finds that there is a want of jurisdiction**, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court (or, for cases within the jurisdiction of the United States Tax Court, to that court) in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from **which it is transferred**.

28 U.S.C. § 1631 (emphasis added).

The Eleventh Circuit has not expressly decided whether § 1631 authorizes a district court to transfer claims where personal jurisdiction (as opposed to subject matter jurisdiction) is lacking. This district has previously observed that whether such transfer is permitted is "unclear."[14] But the Fifth

---

[14] *Durham v. LG Chem, Ltd.*, No. 1:20-CV-01277-SDG, 2021 WL 1573899, at *4 n. 25 (N.D. Ga. Apr. 22, 2021) (stating that transfer under § 1631 "might only be proper where the Court lacks *subject matter* jurisdiction, not personal

Circuit recently held that § 1631 *does* permit the transfer of claims over which a court lacks personal jurisdiction, and if the "interest of justice" criterion is satisfied, may even require it. *See Franco v. Mabe Trucking Co.*, *Inc.,* 3 F.4th 788, 793 (5th Cir. 2021). In *Franco*, the Fifth Circuit considered the plain language of § 1631, noting that it does not "confine itself to personal or subject-matter jurisdiction, but instead 'a want of jurisdiction' generally." *Id.* at 792. The First and Sixth Circuits similarly determined that the term "jurisdiction" in § 1631 should be read to encompass both personal and subject-matter jurisdiction. *See Fed. Home Loan Bank of Bos. v. Moody's Corp.*, 821 F.3d 102, 114 (1st Cir. 2016), *abrogated on other grounds by Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82 (2017); *Roman v. Ashcroft*, 340 F.3d 314, 328 (6th Cir. 2003). The Third and Eighth Circuits have stated in *dicta* that a transfer under § 1631 would be proper to cure a lack of personal jurisdiction. *Franco*, 3 F.4th at 794 (citing *Johnson v. Woodcock*, 444 F.3d 953, 954 n.2 (8th Cir. 2006); *Island Insteel Sys., Inc. v. Waters*, 296 F.3d 200, 218 n.9 (3d Cir. 2002)).

This Court, guided by the plain language of the statute and the weight of circuit authority, considers that it is empowered under § 1631 to transfer

jurisdiction"); *Brown v. Ford Motor Co.*, 347 F. Supp. 3d 1347, 1351 (N.D. Ga. 2018) (stating that "[c]ourts are split as to whether § 1631 applies to permit transfer to cure a lack of personal jurisdiction.").

the claims of the non-Georgia opt-in plaintiffs. *Franco*, 3 F.4th at 793 (stating that "[t]he plain text of 1631 indicates that it may apply when a district court finds that it lacks subject-matter jurisdiction, personal jurisdiction, or both").

As for the interest of justice criterion, it is satisfied here. The out-of-state opt-in plaintiffs showed diligence in the pursuit of their claims by timely filing consents to join the action. Many, moreover, did so after earlier filing timely consents to join the collective action in the *Berry* case.[15]  It would be unjust to dismiss these timely filed claims, particularly where the plaintiffs in question could not reasonably have anticipated the developments in FLSA case law following *Bristol-Myers Squibb*. Transfer is additionally in the interest of justice because the alternative – dismissal – would have the practical effect of leaving the non-Georgia plaintiffs with no remedy at all, given the statute of limitations. *See ITT Base Servs. v. Hickson*, 155 F.3d 1272 (11th Cir. 1998) (finding that transfer under § 1631 was in the interest of justice where dismissal would operate to time-bar the claim); *see also Franco*, 3 F.4th at 796 (stating that when there is both a lack of jurisdiction and the interests of justice

---

[15] In *Berry*, the district court denied plaintiffs' request for certification of a nationwide class, finding the evidence "too paltry to establish that all Steak 'n Shake servers are similarly situated."  *See* Doc. 44-9 (Order at 11, *Berry v. Steak N Shake, Inc.*, No. 1:20-cv-2932 (S.D. Ind. July 19, 2021)).

weigh in favor of transfer, the plain language of the statute compels the district court to transfer the claim).[16]

Brown's request for additional time to select the appropriate forum for the non-Georgia claims (Doc. 62 at 11) is reasonable. Should Brown still seek transfer of these claims under § 1631, he shall, within 14 days of this order, file an amended motion seeking such relief and identifying the requested transfer jurisdiction for each out-of-state opt-in plaintiff.

## B. Plaintiff's Request to Toll the Statute of Limitations for Georgia Putative Class Members Who Have Not Opted In

Actions brought pursuant to the FLSA must be filed within two years of the time the cause of action accrues or, in the case of willful violations as alleged in this case, within three years. 29 U.S.C. § 255(a). In an FLSA

---

[16] Defendant further argues that dismissal of the non-Georgia opt-in claims is required under *Mickles v. Country Club, Inc.*, 887 F.3d 1270 (11th Cir. 2018). The Court reads *Mickles* to weigh in favor of the opposite result. In *Mickles*, the Circuit considered a district court order denying a motion for conditional certification as untimely. The order had the practical effect of dismissing the opt-in claims with prejudice, "since it effectively barred further litigation under the relevant statute of limitations." *Id.* at 1280. Cautioning that dismissal with prejudice should be a "sanction of last resort," the Circuit held that, after the district court denied the certification motion, the opt-ins' claims should have been dismissed *without* prejudice so they could be pursued elsewhere. *Id.* at 1280-81. *Mickles* thus suggests that district courts should tread carefully when dismissal of opt-ins' claims would – as here – result in those claims being time-barred. Unlike in this case, transfer does not appear to have been sought in *Mickles*.

collective action, the filing of a lawsuit does not toll the statute of limitations for putative class members. Rather, the statute continues to run until a class member files his opt-in consent form. *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1106 (11th Cir. 1996) ("[C]ongress expressed the concern that an opt-in plaintiff should not be able to escape the statute of limitations bearing on his cause of action by claiming that the limitations period was tolled by the filing of the original complaint."); *Bennett v. Advanced Cable Contractors, Inc.,* No. 1:12-CV-115-RWS, 2012 WL 1600443 (N.D. Ga. May 7, 2012).

Here, the parties agree that Defendant stopped employing tipped servers after the onset of the COVID-19 pandemic, and most, if not all, putative plaintiffs' claims will be barred unless subject to tolling. Plaintiff moves to toll absent class members' claims, citing both the delay in this Court adjudicating the certification motion and the possibility that putative collective members may not have known, within the limitations period, that they had FLSA claims against Defendant. Defendant opposes equitable tolling on two grounds. First, it argues that a named plaintiff in an FLSA action lacks standing to seek equitable tolling on behalf of putative collective members. Second, it argues that Plaintiff has not shown that potential collective members pursued their rights diligently or that this case involves the kind of extraordinary circumstances that warrant tolling.

### 1.    Legal Standard for Equitable Tolling

Equitable tolling is "the doctrine under which plaintiffs may sue after the statutory time period has expired if they have been prevented from doing so due to inequitable circumstances." *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 706 (11th Cir. 1998). It is "an extraordinary remedy which is typically applied sparingly." *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000). Equitable tolling may be permitted, however, in circumstances involving "an inequitable event that prevented plaintiff's timely action." *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993).

"Equitable tolling requires the party invoking it to show both extraordinary circumstances and diligence in pursuing her rights." *Wilson v. Standard Ins. Co.*, 613 F. App'x 841, 844 (11th Cir. 2015); *see also Downs v. McNeil,* 520 F.3d 1311, 1324 (11th Cir. 2008). Plaintiff has the burden of showing that equitable tolling is warranted. *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 661 (11th Cir. 1993).

The Eleventh Circuit "has defined 'extraordinary circumstances' narrowly, and ignorance of the law does not, on its own, satisfy the constricted 'extraordinary circumstances' test." *Jackson v. Astrue*, 506 F.3d 1349, 1356 (11th Cir. 2007) (citations omitted); *Wakefield v. Railroad Retirement Board,*

131 F.3d 967, 970 (11th Cir. 1997) ("Ignorance of the law usually is not a factor that can warrant equitable tolling.").

### 2.    Whether Brown Can Seek Tolling for Putative Plaintiffs

We turn next to whether the law of this Circuit permits Brown to seek equitable tolling on behalf of putative collective members who have not joined the case.  Defendant, citing *Cameron-Grant v. Maxim Healthcare Servs., Inc.,* 347 F.3d 1240 (11th Cir. 2003), says that it does not.

In *Cameron-Grant*, the Eleventh Circuit considered whether a named plaintiff who had settled his FLSA claims could appeal a district court's order denying his motion to notify potential opt-ins about the action.  Framed broadly, the "pertinent question" was whether "the named plaintiff in a § 216(b) action under the FLSA has the right to represent other plaintiffs".  *Id.* at 1247.  To answer this question, the Circuit compared the respective, representative capacities of a named plaintiff in a Rule 23 class action with a named plaintiff in an FLSA case.  It considered that Congress envisioned a fundamentally different and more circumscribed role for the FLSA plaintiff, whose action does not become a collective "unless other plaintiffs affirmatively opt into the class by giving written and filed consent." *Id.* at 1249.  Unlike a Rule 23 named plaintiff, a plaintiff in an FLSA case "has no right to represent [other plaintiffs]" even if he is similarly situated to them.  *Id.*  The Circuit thus

decided the narrow question in *Cameron-Grant* against the plaintiff. Having settled his claim, the plaintiff could not, on behalf of putative opt-ins, appeal the trial court's order denying his notification motion. Against this factual and legal background, the Eleventh Circuit made the following broad pronouncement: "[i]n contrast to the Rule 23 plaintiff, a § 216(b) plaintiff has no claim that he is entitled to represent other plaintiffs." *Id.* at 1249.

Courts in this Circuit disagree about how to apply *Cameron-Grant*. Courts in this district have held that under its reasoning, named plaintiffs may not move to toll the FLSA's statute of limitations on behalf of persons who have not yet opted in. *See Walton v. Publix Supermarkets, Inc.*, No. 1:19-CV-4466-LMM, 2019 WL 13214175, at *2 (N.D. Ga. Dec. 5, 2019) ("Since FLSA collective-action plaintiffs lack authority to represent putative class members, Plaintiffs in this case cannot seek equitable tolling for Publix employees not involved in this case."); *Sellers v. Sage Software, Inc.*, No. 1:17-CV-03614-ELR, 2018 WL 5631106 (N.D. Ga. May 25, 2018) ("For those putative plaintiffs who have not yet opted into the suit, Plaintiffs do not represent them, and therefore, Plaintiffs have no authority to seek equitable tolling on their behalf."). Another court in this Circuit decided otherwise. *See Manasco v. Best In Town, Inc.*, No. 2:21-CV-00381-JHE, 2022 WL 816469, at *11 (N.D. Ala. Mar. 17, 2022)

("[*Cameron-Grant*] says nothing about whether a court may toll the limitations period."). Outside the circuit, there is a similar divergence of authority.[17]

Plaintiff argues that (1) *Cameron-Grant* involves different factual and legal issues than those presented here; and (2) Brown's authority to represent others' interests cannot be so hindered as Defendant claims, because FLSA plaintiffs are empowered to take certain acts on behalf of absent plaintiffs, such as appealing the denial of collective action status. These are valid points. At the end of the day, however, this Court need not decide whether *Cameron-Grant* prohibits the relief Plaintiff seeks. This is because, for reasons discussed in the following section, Plaintiff has failed – at least at this stage – to satisfy the Eleventh Circuit's exacting standard governing equitable tolling of a statute of limitations.

---

[17] Some district courts have declined to grant equitable tolling to absent class members, citing lack of jurisdiction or prudential standing concerns. *See, e.g., Atkinson v. TeleTech Holdings, Inc.*, No. 3:14-CV-253, 2015 WL 853234, at *8 (S.D. Ohio Feb. 26, 2015) ("because the potential opt-in plaintiffs do not become parties to the lawsuit until they file their consent forms with the court, the court lacks jurisdiction to grant them equitable relief"); *Tidd v. Adecco USA, Inc.*, No. CIV.A. 07-11214-GAO, 2010 WL 996769, at *3 (D. Mass. Mar. 16, 2010) ("Because these persons have not yet opted-in to the case, the plaintiffs are, in effect, asking for an advisory opinion, which the Court cannot issue.") Other courts see no jurisdictional or FLSA-based impediment to tolling putative plaintiffs' claims. *See., e.g., Wintjen v. Denny's, Inc.*, No. 2:19-CV-00069-CCW, 2021 WL 5370047 (W.D. Pa. Nov. 18, 2021) (tolling statute of limitations for opt-in plaintiffs); *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183 (E.D.N.Y. 2015) (same).

### 3.    Application of Equitable Tolling Doctrine

As previously discussed, a plaintiff who seeks equitable tolling must prove "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971 (11th Cir. 2016) (quoting *Menominee Indian Tribe of Wisc. v. United States*, 577 U.S. 250, 255 (2016)).  Further, when a plaintiff seeks equitable tolling for putative opt-ins, he must provide evidence of the diligence *of the potential opt-in plaintiffs*—not the named plaintiffs who are already part of the case—to assert their rights within the statutory period in the face of extraordinary circumstances. *Manasco*, 2022 WL 816469, at *12; *Carr v. AutoZoner, LLC*, 501 F. Supp. 3d 1237 (N.D. Ala. 2020).  Here, Brown pursues a sort of "totality of the circumstances" approach, arguing that delay and other factors discussed below together show plaintiffs' diligence and amount to the kind of extraordinary circumstances that necessitate tolling.

Plaintiff's brief focuses chiefly on litigation delay as a reason to grant equitable tolling.  This is understandable.  The original motion for conditional certification was filed in December 2021.  Following a limited period of discovery, Plaintiff filed a supplemental motion in support of certification.  The latter motion has been pending for over a year.  In the interim, the statute of

limitations has been running.  Absent equitable tolling, most if not all putative plaintiffs' claims will be time-barred.

The Eleventh Circuit has yet to address the specific question of whether the FLSA's statute of limitations may be equitably tolled for claims of potential plaintiffs based on a delay in resolving certification and providing notice. *Lockwood v. CIS Servs., LLC*, No. 3:16-CV-965-J-39PDB, 2018 WL 8559245, *2 (M.D. Fla. Jan. 16, 2018); *Love v. Phillips Oil, Inc.*, No. 3:08CV92/MCR/MD, 2008 WL 5157677, at *2 (N.D. Fla. Dec. 9, 2008).  Lower courts across the country are divided on this question.  Outside of this circuit, district courts grant equitable tolling for litigation delays with some frequency.[18]  In this circuit, however, most district courts to consider the question have held that court-caused delay in the notice and certification process is not the kind of

---

[18] *See, e.g., Wintjen v. Denny's, Inc.,* No. 2:19-CV-00069-CCW, 2021 WL 5370047, at * 18 (W.D. Pa. Nov. 18, 2021) (granting equitable tolling to putative plaintiffs where adjudication of motion for conditional certification was delayed for one year); *Tubiak v. Nielsen Co. (US), LLC,* 2016 WL 796861, *4 (S.D.N.Y. Feb. 25, 2016) (stating that the claims of potential class members should not be penalized based on delays in rulings); *see also Israel Antonio-Morales v. Bimbo's Best Produce, Inc.,* No. CIV.A.8:5105, 2009 WL 1591172, at *1 (E.D. La. Apr. 20, 2009) ("Courts routinely grant equitable tolling in the FLSA collective action context to avoid prejudice to actual or potential opt-in plaintiffs that can arise from the unique procedural posture of collective actions under 29 U.S.C. § 216(b).").

extraordinary occurrence that warrants equitable tolling.[19]  There have been

exceptions to that general rule, but not many.[20]  The undersigned has found no

---

[19] *See, e.g., Carr v. AutoZoner, LLC*, 501 F. Supp. 3d 1237, 1247-48 (N.D. Ala. 2020) (declining to toll statute of limitations for putative opt-ins, where case was filed in 2015 but potential plaintiffs did not receive court-approved notice of the action until 2017); *Lockwood v. CIS Servs., LLC*, No. 3:16-cv-965-J-39PDB, 2018 WL 8559245, at *2 (M.D. Fla. Jan 16, 2018) (denying motion to toll statute of limitations where the motion to conditionally certify had been pending for ten months); *Jackson v. Fed. Nat'l Mortg. Ass'n*, No. 1:15-CV-1411-AT, 2016 WL 8938515, at *2 (N.D. Ga. July 25, 2016) (declining to toll statute of limitations where nine months elapsed between the date on which plaintiff filed her motion for conditional certification and the court's order granting the same); *Czopek v. TBC Retail Grp., Inc.*, No. 8:14-cv-675-T-36TBM, 2015 WL 12915566, at *2 (M.D. Fla. Aug. 7, 2015) (stating that a seven-month delay in adjudicating certification was not unusual, and denying a motion to toll limitations period for the opt-in plaintiffs' claims for the period when the motion to conditionally certify was pending); *Bobbitt v. Broadband Interactive, Inc.*, No. 8:11-CV-2855-T-24, 2012 WL 2872846, at *2 (M.D. Fla. July 12, 2012) (denying equitable tolling where plaintiffs were unable to send court-authorized notices to class members until thirteen months after the motion to certify class was filed); *Love v. Phillips Oil, Inc.*, No. 3:08-cv-92, 2008 WL 5157677, at *2, n.2 (N.D. Fla. Dec. 9, 2008) (denying motion for equitable tolling where nine months elapsed between the filing of the complaint and the date of conditional certification); *In re Tyson Foods, Inc.*, 2008 WL 4613654, at *1, 4 (M.D. Ga. 2008) (declining to equitably toll claims in case involving delay of more than six years).

[20] *See, e.g., Chapman v. Fred's Stores of Tennessee, Inc.*, No. 2:08-CV-01247-HGD, 2013 WL 1767791, at *15 (N.D. Ala. Mar. 15, 2013), *report and recommendation adopted*, No. 2:08-CV-01247-HGD, 2013 WL 1760000 (N.D. Ala. Apr. 22, 2013) (permitting equitable tolling in FLSA case where "the delay in sending notice to potential class members has stemmed from a delay in the ruling on the Motion to Facilitate Notice" and "[t]his delay was through no fault of any potential plaintiff."); *Gutescu v. Carey Int'l, Inc.*, No. 01-4026CIV-MARTINEZ, 2004 WL 5333763, at *4 (S.D. Fla. Feb. 25, 2004) (allowing

instance within this Circuit in which a district court tolled the FLSA's statute of limitations for litigation delay alone.

Likely in recognition of the law in this regard, Plaintiff argues next that putative plaintiffs' claims must be tolled because Defendant "did not provide notice or otherwise advise its employees that the 80/20 rule existed[.]" (Doc. 65 at 11.)  But he provides no legal authority in support of this position.  The argument that tolling should apply where an employer has failed to notify putative plaintiffs of their rights under the FLSA may meet with success in other circuits,[21] but it is all but foreclosed here.  The Eleventh Circuit has held that an employer's failure to advise workers of their employment rights will not normally toll the limitations period.  *McClinton v. Ala. By-Products Corp.*, 743 F.2d 1483, 1486 n. 5 (11th Cir. 1984) (finding that while an employer's failure to post notice of workers' rights under ADEA "may toll the 180-day notification period, it will not normally toll the two-year statute of limitations

---

equitable tolling because the "Motion to Certify Class remained pending for an unusual amount of time").

[21] *See, e.g., Cruz v. Maypa*, 773 F.3d 138, 146-47 (4th Cir. 2014) (reversing denial of motion to dismiss and remanding for discovery on plaintiff's request to toll FLSA claim on ground that employer failed to post notice); *Young Chul Kim v. Cap. Dental Tech. Lab'y, Inc.*, 279 F. Supp. 3d 765, 772 (N.D. Ill. 2017) (denying summary judgment where a reasonable jury could find that required labor posters were not displayed, and that tolling could be warranted).

for bringing the action in court, which continues to run from the date of the alleged wrongful act" and stating that "even if the notification period is tolled, an employee will usually be absolutely barred from filing suit after two years."); *Kazansas v. Walt Disney World Co.,* 704 F.2d 1527 (11th Cir. 1983) (finding that failure to post required notice of rights under the ADEA might justify equitable tolling of the time requirements for filing a charge of discrimination, but it would not justify equitable tolling of the statute of limitations on commencing an action); *Lucas v. Molten*, No. 2:16-CV-00556-VEH, 2016 WL 2754450, at *5 (N.D. Ala. May 12, 2016) ("equitable tolling does not apply merely because the FLSA notice was not posted"); *Antenor v. D & S Farms*, 39 F. Supp. 2d 1372, 1379-80 (S.D. Fla. 1999) (circuit precedent prevented equitable tolling for employer's failure to advise employees regarding FLSA's requirements).

Plaintiff does not attempt to distinguish the foregoing authority. Neither does he address binding precedent holding that ignorance of the law "usually is not a factor that can warrant equitable tolling." *Wakefield v. Railroad Retirement Board,* 131 F.3d 967, 970 (11th Cir. 1997); *Pendlebury v. Starbucks Coffee Co*., No. 04-80521-CIV, 2008 WL 700174, at * 4 (S.D. Fla. Mar. 13, 2008) (declining to toll FLSA's statute of limitations where "the only argument that

these Plaintiffs seem to advance for not asserting their rights outside of this collective action is a simple ignorance that they could assert such a claim.").

Plaintiff next argues that putative plaintiffs may have lacked knowledge of certain key facts – facts known only by Defendant, such as point-of-sale data – that support the alleged minimum wage violations. (Doc. 65 at 11.) He likens this case to *Chapman v. Fred's Stores of Tenn., Inc.*, No. 2:08-CV-01247-HGD, 2013 WL 1767791 (N.D. Ala. Mar. 15, 2013), *report and recommendation adopted*, No. 2:08-CV-01247-HGD, 2013 WL 1760000 (N.D. Ala. Apr. 22, 2013), and urges this Court to follow its holding. In *Chapman*, the plaintiff sued under the Equal Pay Act on behalf of a putative collective of female assistant store managers who were paid less than their male counterparts. *Id*. at *1. Plaintiff sought tolling where "the delay in sending notice to potential class members [had] stemmed from a delay in the ruling" on plaintiff's request for class notice. *Id*. at *15. In *Chapman*, just as in this case, the collective's claims would be extinguished absent tolling because "the statute of limitations, whether two or three years, will have run for many, if not all, potential plaintiffs." *Id*. After surveying the Eleventh Circuit's tolling jurisprudence, the court in *Chapman* tolled the FLSA's statute of limitations both because of delay in deciding certification and because it was plausible to assume that putative plaintiffs did not discover the gender gap in pay before the limitations

window.  In so doing, it distinguished FLSA overtime cases, such as *In re Tyson Foods, Inc.*, No. 4:07-MD-1854 (CDL), 2008 WL 4613654 (M.D. Ga. Oct. 15, 2008), in which putative plaintiffs generally know of potential FLSA claims at the time they occur.  The court stated:

> While the plaintiffs in *Tyson Foods* were aware they were working off the clock and not getting paid for that time, female [assistant store managers] may have been completely unaware that male [assistant store managers] may have been paid more, assuming arguendo plaintiff's allegations to be true.

*Id.* at * 16; *see also Jackson*, 2016 WL 8938515, at *2.

The comparison to *Chapman* is apt with respect to the question of litigation delay.  Here, as in *Chapman*, the litigation delay has been significant and potentially detrimental to the interests of putative opt-ins.  Having said that, Plaintiff makes little effort to show how this case is like *Chapman* in the more significant aspect of its holding – that tolling was warranted under the law because potential opt-ins did not know key facts relating to their legal claim within the relevant statutory period.

Plaintiff does not spend more than a sentence or two on this piece of his tolling argument.  He states in passing that potential opt-ins did not have point-of-sale data, the implication being that, with such data, they might have pursued their claims with greater vigor, at an earlier juncture.  This argument is not very persuasive, however, for while potential plaintiffs perhaps did not

possess knowledge of the exact amount of shift time spent performing tipped tasks, they presumably did know that they were required to spend a lot of time doing untipped work for which they were paid less than minimum wage.  The facts that Plaintiff lifts up for comparison therefore are more like those that *Chapman* rejects as a basis for tolling than those it credits.  Brown has not alleged that any act by Defendant has "lulled the potential [] opt-in plaintiffs into inaction."  *Tyson Foods*, 2008 WL 4613654 at *4.  Neither has the Court found in Plaintiff's motion any other basis for tolling sanctioned in this Circuit, such as an assertion of late-discovered facts, misrepresentation, or other acts that prevented timely filing.[22]

Considering the legal authority discussed above and the equitable interests at stake, the Court determines that the best course of action is to deny the request for tolling without prejudice to opt-in plaintiffs later raising

_____

[22] *See, e.g., Jones v. Dillard's, Inc.*, 331 F.3d 1259 (11th Cir. 2003) (permitting tolling in an age discrimination case in which plaintiff learned, after the limitations window closed, that employer filled plaintiff's position with a younger employee); *Browning v. AT&T Paradyne*, 120 F.3d 222, 226-27 (11th Cir. 1997) (approving of tolling where plaintiff was reasonably induced to delay the filing of a claim by receipt of inaccurate information from an EEOC employee, but cautioning that the holding was "a very narrow one"); *Reeb v. Econ. Opportunity Atlanta, Inc.*, 516 F.2d 924, 931 (5th Cir. 1975) (stating that time to file EEOC charge in gender discrimination case did not begin to run "until the facts that would support a charge of discrimination . . . were apparent or should have been apparent to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff.")

the issue. *Manasco,* 2022 WL 816469, at *12 (finding the tolling decision "premature", and permitting plaintiffs to raise tolling if it later became apparent that plaintiffs' claims would be barred absent tolling). Put another way, if "future opt-in plaintiffs wish to argue for equitable tolling, they may do so on their own behalf." *Walton*, 2019 WL 13214175, at *3.

Perhaps future opt-ins will make the requisite showing. *McClinton v. Alabama By–Products Corp.,* 743 F.2d 1483, 1485 (11th Cir. 1984) (whether to equitably toll a limitations period "is determined on a case-by-case basis, depending on the equities of the situation."). Any future request for equitable tolling should incorporate discussion of the relevant legal standards and precedent *from this Circuit*. The request to toll the claims of Georgia putative plaintiffs is DENIED WITHOUT PREJUDICE.

## C.    Plaintiff's Request to Toll Claims of Out-of-State Opt-In Plaintiffs

Brown asks the Court to toll the claims of non-Georgia opt-in plaintiffs "from the date they *first* filed their consent forms." (Doc. 65 at 9) (emphasis in original). Defendant responds that the Court lacks personal jurisdiction over these claims and therefore cannot toll them. Plaintiff does not respond to this argument at all, beyond to state that the Court held the dismissal order in abeyance. Plaintiff cites no authority to show that this Court is empowered to

toll FLSA claims over which it has no personal jurisdiction. It is further unclear that tolling is necessary here for opt-ins who timely filed consents to join and whose claims will be transferred. 28 U.S.C. § 1631 (stating that an action transferred pursuant to this statute "shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred."). Plaintiff's request to toll the claims of out-of-state opt-ins is DENIED.

### D.    Plaintiff's Request to Modify Class Definition

Brown wants to modify the class definition following the Court's jurisdictional ruling. (Doc. 62 at 15; Doc. 65 at 1.) The new, proposed class definition would read:

> [A]ll current and former tipped employees who worked for Defendant in Georgia for at least one week during the three year period prior to the filing of this action to the present.

(Doc. 65 at 1.) Defendant objects to Plaintiff's inadvertent exclusion of the phrase "in Georgia" from the class definition proposed in Plaintiff's motion. (Doc. 63 at 14.) But Plaintiff has since clarified in his reply that he mistakenly left off the phrase "in Georgia" in his opening brief, and wants it included. (Doc. 65 at 1.) Defendant does not otherwise object to the modified definition. Plaintiff's request to modify the class definition is GRANTED.

## IV.    Plaintiff's Request for Notice to Putative Class Members

Plaintiff filed a motion for approval of the notice he wishes to send to potential class members.  (Doc 25.)  For various reasons, Defendant opposes the notice and Plaintiff's proposed methods of distribution.  (Doc. 45.)

A district court, in appropriate cases, may authorize the sending of notice to potential class members in a collective action.  *See Hoffmann-La Roche Inc.*, 493 U.S. at 169-70; *Hipp*, 252 F.3d at 1219.  "The benefits of a collective action depend on employees receiving accurate and timely notice so that they can make informed decisions about whether to participate." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008) (quotation marks and citation omitted).

A court has discretion over the form of the notice provided for an FLSA collective action, and such notice should be phrased to prevent confusion and unfairness.  *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 921 (11th Cir. 2014) (citing *Hoffmann-La Roche, Inc.*, 493 U.S. at 169-71).  Court-authorized notices help prevent "misleading communications" and ensure that the notice is "timely, accurate, and informative."  *Hoffmann-La Roche*, 493 U.S. at 171.

The proposed notice in this case was filed in December 2021, along with Plaintiff's original motion for certification of a nationwide collective.  The parameters of the case have changed significantly in the interim.  The parties

50

are therefore directed to confer about the notice according to the schedule set forth at the end of this order. They should discuss the notice's form and content, delivery method, and whether notice should be sent to persons who may have signed arbitration agreements.[23] They should attempt to agree on as many aspects of the notice process as possible.

The Court acknowledges that sending notice to putative plaintiffs whose claims may have expired is generally a practice to be avoided. *See, e.g., Reece v. United Home Care of N. Atlanta, Inc.,* No. 1:12-CV-2070-RWS, 2013 WL 895088 (N.D. Ga. Mar. 8, 2013) (declining to send notice to putative plaintiffs whose claims expired). But this case has involved a unique combination of unexpected jurisdictional issues, a delayed certification decision, and over 1,000 tipped servers with colorable FLSA claims. The provision of class notice

---

[23] *See, e.g., In re J.P. Morgan Chase & Company*, 916 F.3d 494, 503 (5th Cir. 2019) ("Where a preponderance of the evidence shows that the employee has entered into a valid arbitration agreement, it is error for a district court to order notice to be sent to that employee as part of any sort of certification."); *Mennucci v. Randstad Pros. US, LLC*, No. 1:19-CV-4693-TWT, 2021 WL 2603711, at * 4 (N.D. Ga. Mar. 2, 2021) ("Employees who signed a binding arbitration agreement are not potential plaintiffs and should not receive notice of the lawsuit.").

is an appropriate next step that balances the legal and equitable considerations at issue here.[24]

To minimize any risk of misunderstanding to potential plaintiffs, the notice shall advise recipients of the applicable statute of limitations and that receipt of the notice does not mean that the recipient has claims that fall within the statute of limitations. *See, e.g. Pizano v. Big Top Party Rentals, LLC*, No. 15-CV-11190, 2018 WL 2193245 (N.D. Ill. May 14, 2018) (permitting notice to persons whose claims would have expired without tolling, but requiring notice about possible statute of limitations bar to claims); *Lopez v. JVA Indus., Inc.*, No. 14 CIV. 9988 KPF, 2015 WL 5052575, at *6 (S.D.N.Y. Aug. 27, 2015) (permitting notice to all potential plaintiffs employed within three years of the date of the filing of the complaint, and deferring consideration of the statute of limitations until after the opt-in period, at which time "any individual would-be plaintiffs whose claims have expired may seek equitable tolling as it may apply to them."). The motion for notice is GRANTED IN PART, in that notice

---

[24] *See, e.g., Wtitt v. Am. Disposal Servs. of Georgia, Inc.*, No. 1:18-CV-2516-TWT, 2018 WL 6716046, at *2, 19 (N.D. Ga. Dec. 20, 2018) ("Courts typically do not address the statute of limitations at the conditional certification stage because doing so would require courts to reach the merits of the underlying claims.").

will be permitted. Notice content and delivery method will be determined expeditiously following the conclusion of the process described below.

## V. Conclusion

For the reasons stated above:

1. Plaintiff's request for conditional certification (Doc. 23, 40) is GRANTED IN PART. The Court conditionally certifies a collective action consisting of: [a]ll current and former tipped employees who worked for Defendant in Georgia for at least one week during the three-year period prior to the filing of this action to the present. Excluded from this definition are any individuals who are plaintiffs in *Berry, et al. v. Steak N. Shake, Inc.*, No. Civ. A. 1:20-cv-2932-JMS-MPB (S.D. Ind.) or who worked in Ohio. (Doc. 23 at 1, n.1.)

2. Plaintiff's motion for equitable tolling and other relief (Doc. 62) is GRANTED IN PART and DENIED IN PART.

3. Plaintiff, should he still wish to request transfer of the claims of out-of-state opt-in plaintiffs, is DIRECTED to file, within 14 days of this order, an amended motion seeking such transfer and identifying the requested transfer jurisdiction for each opt-in plaintiff. Defendant shall have 14 days from the date of the amended motion to respond. Plaintiff shall have 14 days to reply.

4. Defendant is DIRECTED to generate and provide to Plaintiff's counsel by June 7, 2023, a list of all potential collective members and the full contact information available for such members, including email addresses. The provision of this list will facilitate counsel's practical assessment of any adjustments required in the notice plan.

5. Plaintiff's motion for court-approved notice (Doc. 25) is GRANTED IN PART. The Court DIRECTS the parties to meet and confer as soon as practicable regarding the proposed notice, proposed consent form, and objections thereto. The parties should additionally confer on whether notice should be sent to putative class members who have signed arbitration agreements.

6. The Court DIRECTS the parties to submit a joint, revised proposed notice and consent form by June 21, 2023. If there are minor disagreements as to notice terms and delivery method, the parties should note those disagreements in the joint notice. If significant disagreement remains after a good faith effort to negotiate notice/delivery terms, each party is directed to submit its own version of the proposed notice and proposed method of delivery to

the Court by June 21, 2023.  The Clerk is DIRECTED to submit this matter to the undersigned on June 22, 2023.

**SO ORDERED** this 17th day of May, 2023.

_____
SARAH E. GERAGHTY
United States District Judge